IN THE

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM, 2022

ARGUED: MAY 17, 2023
DECIDED: NOVEMBER 28, 2023

No. 22-313

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

STEPHEN M. CALK, AKA, SEALED DEFENDANT 1,

*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Southern District of New York.
19-cr-366 – Schofield, *District Judge.*

————

Before: CALABRESI, LOHIER, NATHAN, *Circuit Judges.*

———

Defendant-Appellant Stephen Calk ("Calk") appeals from his convictions following a jury trial in the United States District Court for the Southern District of New York (Schofield, *J.*). Calk was convicted under the financial institution bribery statute, 18 U.S.C. § 215, for facilitating approval of certain loans in exchange for the loan applicant's assistance in securing Calk's appointment to a position in an incoming presidential administration. Calk was also convicted under 18 U.S.C. § 371 of conspiracy to commit financial institution bribery in violation of Section 215. On appeal, Calk argues that his conduct was not "corrupt" within the meaning of Section 215(a) and that the loan applicant's "assistance" in securing Calk's appointment to a position in that presidential administration was not a "thing of value" within the meaning of Section 215(a). Calk further challenges the jury instructions and the sufficiency of the evidence to support his convictions. Separately, Calk argues that his convictions were secured through reliance on testimony procured through an improper grand jury subpoena. We find that Calk's challenges are without merit. We therefore AFFIRM his convictions.

———————————————

PAUL M. MONTELEONI, Assistant United States Attorney (Alexandra Rothman, Hagan Scotten, Thomas McKay, Assistant United States Attorneys, *on the brief*), for Damian Williams, United States Attorney for the Southern District of New York, New York, N.Y.

ALEXANDRA A.E. SHAPIRO (Daniel J. O'Neill, Avery D. Medjuck, Shapiro Arato Bach LLP, New York, N.Y., Paul H. Schoeman, Darren A. LaVerne, Kramer Levin Naftalis & Frankel LLP, New York, N.Y., *on the brief*), for *Defendant-Appellant*.

———————————————

CALABRESI, *Circuit Judge*:

This case asks us, as a matter of first impression, to interpret the scope of the financial institution bribery statute, 18 U.S.C. § 215. A jury convicted Stephen Calk ("Calk"), Defendant-Appellant, of one count of financial institution bribery in violation of Section 215(a)(2) and one count of conspiracy to commit financial institution bribery in violation of 18 U.S.C. § 371. The United States District Court for the Southern District of New York (Schofield, *J.*) sentenced Calk to a term of 366 days' imprisonment, followed by two years' supervised release, and imposed a $1.25 million fine.

On appeal, Calk raises four challenges. *First,* Calk challenges (a) what constitutes "corrupt" conduct under Section 215(a); (b) what constitutes a "thing of value" under Section 215(a); and (c) how to determine the monetary value of a "thing of value" under Section 215(a), all elements of the crime. *Second,* Calk argues that there is insufficient evidence in the record to uphold his convictions. *Third,* Calk argues that the district court's jury instructions were erroneous. *Fourth,* Calk claims that the district court failed to exclude prejudicial testimony that the prosecution allegedly procured through the improper use of a grand jury subpoena. We conclude that Calk's challenges are without merit.

We hold:

> *First,* that "corrupt" conduct describes actions motivated by an improper purpose, even if such actions (a) did not entail a breach of duty, and (b) were motivated in part by a neutral or proper purpose, as well as by an improper purpose.

*Second*, that a "thing of value" may cover subjectively valuable intangibles, such as political assistance, including endorsements, guidance, and referrals.

*Third*, that the "thing of value" may be measured by its value to the parties, by the value of what it is exchanged for, or by its market value.

We further hold that the jury instructions were proper and that the record includes sufficient evidence that would allow a jury to conclude that Calk, as Chief Executive Officer of a financial institution, improperly facilitated approval of several loan applications in exchange for Manafort's political assistance, which Calk valued at more than $1,000.

Moreover, we hold that the district court properly determined that Calk's conviction did not depend on testimony procured through the improper use of a grand jury subpoena.

Accordingly, we AFFIRM the judgment of conviction.

## BACKGROUND

Calk was, until 2019, the Chairman and Chief Executive Officer of The Federal Savings Bank ("TFSB"), a federal savings association headquartered in Illinois with an office in Manhattan. National Bancorp Holdings, Inc. (the "Holding Company") owns TFSB, and Calk is the principal shareholder of the Holding Company. TFSB keeps deposits insured by the Federal Deposit Insurance Corporation, and it is primarily in the business of extending residential, construction, and other commercial loans.

In 2016, Paul Manafort ("Manafort"), a lobbyist and political consultant, approached TFSB on several occasions to secure loans. By June 2016, Manafort had been appointed chairman of the presidential campaign of then-candidate Donald Trump (the "Trump Campaign"). Each of Manafort's loan applications presented some technical or regulatory challenge, but TFSB found a workaround to each obstacle, either at Calk's express instruction or with Calk's assent.

The Government alleged that, taking advantage of his position as an officer of TFSB, Calk sought to facilitate approval of Manafort's loan applications in exchange for assistance in securing an appointment to a position first with the Trump Campaign and later with the then-incoming presidential administration of Donald Trump (the "Trump Administration"). Because the Government did not specify *which* loan Calk facilitated in exchange for Manafort's political assistance, and because of the numerous exchanges between Calk and Manafort, we begin by reviewing in considerable detail Manafort and Calk's interactions regarding all of Manafort's loan applications. This case, however, ultimately turns on what specific financial transactions Calk exchanged for Manafort's political assistance, including his endorsement, guidance, and referrals for roles in the Trump Campaign and Trump Administration.

## I.    The Loan Applications

## A.    The California Loan

In July 2016, Manafort sought a $5.7 million loan (the "California Loan") to refinance a prior loan and to continue financing construction of a real estate

development in California.[1]  The loan was to be secured by Manafort's property in Virginia and would be repaid from the sale of the completed real estate development.  Calk joined, by video, an initial meeting between Manafort and Dennis Raico ("Raico"), a TFSB loan officer handling the Manafort account.  At the end of that early meeting with Manafort, Calk expressed interest in serving on the Trump Campaign.

Within twenty-four hours of the meeting, TFSB conditionally approved the proposed California Loan.  According to at least one TFSB staff member who was directly involved in the review process, Calk took a particular interest in ensuring swift approval of the California Loan.

After TFSB conditionally approved the California Loan, Calk and Manafort began to discuss Calk's interest in a role in the Trump Campaign.  Within a week of the loan's conditional approval, in August 2016, Manafort contacted TFSB staff to ask for a copy of Calk's resume.  Calk then sent Manafort an email with his resume, and Manafort replied with an offer for Calk to join the National Economic Advisory Committee ("NEAC").  NEAC was a body of prominent businessmen supporting then-candidate Trump.  Calk accepted the offer.  On August 5, 2016, the Trump Campaign announced NEAC's creation, and Calk was named as one of its fourteen members.

Over the two months following TFSB's conditional approval of the California Loan, however, TFSB officers uncovered problems with the proposed

---

[1] Manafort had previously approached TFSB for a loan in April 2016, which the bank declined to issue.

loan.  Appraisals on properties proposed as collateral for the California Loan came out lower than expected.  TFSB staff were unable to verify Manafort's reported income and found a $300,000 delinquency on one of Manafort's credit cards.  A TFSB loan officer wrote a memorandum summarizing these concerns and suggesting that TFSB increase the origination fee and require additional collateral. Calk was not initially included in these exchanges, but, by August 2016, Calk had become directly aware of the problems with Manafort's loan application.

Despite these problems, in October 2016, at Manafort's request and with Calk's endorsement, TFSB approved an increase in the proposed loan amount to $9.2 million.  In an email to Calk, Manafort expressed his gratitude for Calk's assistance in securing the loan increase, stating: "I also want to again thank you for fixing my issue.  It means a lot to me.  You are becoming a very good friend, and I look forward to building our relationship into both a deeper business and personal one."  Trial Tr. 479.

**B.    The Summerbreeze Loan**

On October 19, 2016, shortly before its scheduled closing, Manafort backed out of the California Loan and proposed a new loan (the "Summerbreeze Loan"). The loan amount would increase from $9.2 million to $9.5 million and would be secured by two of Manafort's properties, in addition to some cash deposited at TFSB.  The loan would be made out to Summerbreeze, L.L.C., an entity controlled by Manafort's spouse.

TFSB officers were, at first, reluctant to approve the Summerbreeze Loan. On October 20, 2016, Javier Ubarri ("Ubarri"), the president of TFSB, expressed to

Raico and Calk doubts about the proposed loan, as it would significantly increase the risk to which TFSB would be exposed and TFSB did not generally renegotiate a loan that had been on the brink of closing. But Raico testified that, despite Ubarri's reluctance, Calk "was looking to move forward." Trial Tr. 1029.

Raico, the loan officer handling Manafort's loan applications, then proposed that TFSB broker the Summerbreeze Loan to another lender, the Bank of the Internet ("BofI"). TFSB would earn a commission on the transaction without having to bear fully the loan's risk. On November 7, 2016, Raico emailed Calk and advised him that BofI would approve the loan purchase the next day, which was Election Day.

The following evening, election night, Calk sent Manafort a series of messages. The first related to the impending loan: "Paul, I hope you're having a great night. We should have your approval all wrapped up by tomorrow I am being told. Enjoy the rest of the evening and I'll speak to you then." App. 530. The second referred both to the loan and the election: "Paul, I've got press all day tomorrow. When can we speak to schedule a closing? Do you need me in New York? I'm ready to support in any way." App. 530.

BofI, however, did not approve the loan as early as Raico and Calk anticipated. Based, in part, on representations of Manafort's income made in his tax returns,[2] Ubarri and other TFSB loan officers reconsidered whether TFSB

---

[2] Those, and other representations in Manafort's loan applications, were later found to be fraudulent in a criminal trial against Manafort. *See United States v. Manafort*, Crim. Action No. 17-0201-01 (ABJ) (D.D.C. Sept. 14, 2018).

8

should directly issue the Summerbreeze Loan. And, around November 11, 2016, with no response from BofI, Calk agreed TFSB should underwrite the loan directly, rather than selling the loan to BofI. TFSB sent Manafort a term sheet later that day. That same day, according to Raico's diary and his trial testimony, Calk asked Raico to call Manafort and ask whether Calk was in consideration for Secretary of the Treasury or other positions.

On November 12, 2016, Calk called Manafort directly and engaged him in an approximately eighteen-minute-long conversation. Two days later, Calk emailed Manafort a professional biography and a document titled "Stephen M. Calk Perspective Rolls [sic] in the Trump Administration.docx" that contained a list of official government positions desired by Calk. Supplemental App. 68. The list included ten sub-Cabinet secretary, deputy secretary, and under-secretary positions, ranked by order of preference. Calk further asked Manafort whether he was "aiding in the [presidential] transition in any type of formal capacity[.]" App. 496. Manafort answered: "Total background but involved directly." Calk responded, in relevant part, "Awesome." App. 495-96.

The next day, November 15, 2016, Calk sent Manafort an email with a document titled "Stephen M. Calk — Candidate for Secretary of the Army.docx" and wrote: "Will you please review the attached document prepared at your request and advise what changes and improvements I should make. My goal is to ensure you or my designated prosper [sic] has all of the information they need to have me successfully chosen by the President-Elect. I look forward to your response." Supplemental App. 72. Calk re-sent the same email four days later on

9

November 19, 2016, thanking Manafort for his "assistance in supporting [Calk's] appointment as Secretary of the Army."  Supplemental App. 72.

Calk also consulted with others regarding his desire to serve in the incoming administration, including Steven Cortes ("Cortes"), who had worked on the Trump Campaign, and General Bernard Banks ("Banks"), a friend and member of TFSB's board.  Cortes told Calk that Manafort was unlikely to have any influence in hiring decisions and that advocacy by Manafort could even hurt Calk's candidacy.  At the same time, Cortes advised Calk that he was well-suited for the position of Secretary of the Army because of his professional background.  Banks suggested that Calk complete a list of roles in which he would like to serve if he were unconstrained by concerns about whether he could get the job.  Calk took Banks's advice and sent Manafort a list of potential roles, focusing on Secretary of the Army.  Calk also reached out to other former army officials and associates asking for advice and assistance.

The Summerbreeze Loan closed on November 16, 2016.

## C.  The Union Street Loan

In November 2016, Manafort presented TFSB with a proposal for an additional $6.5 million loan to refinance and renovate a townhouse in Brooklyn (the "Union Street Loan").  Like the earlier loan proposals, the Union Street Loan was to be issued at TFSB's standard terms and rates.  But TFSB's lending limit barred TFSB from extending the $6.5 million Union Street Loan while the $9.5 million Summerbreeze Loan was still on the books.  To comply with its lending limit, TFSB sought to sell the Summerbreeze Loan to BofI.

Around the same time, Manafort was promoting Calk for positions in the Department of Defense. On November 25, 2016, nine days after TFSB closed the Summerbreeze Loan and while TFSB was still considering the Union Street Loan, Calk emailed Manafort an updated version of the document titled "Stephen M. Calk Perspective Rolls [sic] in the Trump Administration.docx," with Secretary of the Army listed as the first choice for a position in the incoming Trump Administration. Supplemental App. 79-80. On November 30, 2016, Manafort recommended Calk for Secretary of the Army to Jared Kushner ("Kushner"), a member of the Trump Presidential Transition Team (the "PTT"), and Kushner forwarded Manafort's recommendation to other members of the PTT for consideration.

That same day, Manafort emailed Raico, copying Calk, asking about the status of the Union Street Loan. Manafort wrote: "The clock is ticking and we are getting pressure on a number of fronts. [Please] advise today." Trial Tr. 528. At that point, a foreclosure proceeding on a Manafort property in Brooklyn, the proposed collateral for the Union Street Loan, had been initiated, and foreclosures were scheduled on several other Manafort properties. By then, Calk had also been informed of the impending foreclosures on Manafort's properties and of the risk those foreclosures posed to Manafort's credit.

In early December 2016, Calk emailed Manafort regarding a potential meeting with the President-Elect. Calk also asked if Manafort was "making any progress re Sec Army[.]" Trial Tr. 535. Manafort responded that the President-Elect was not taking any meetings related to appointments but that Manafort would be calling later that day with "updates." Trial Tr. 535-36.

On December 7, 2016, Manafort again emailed Raico regarding the status of the Union Street Loan, copying Calk. The email's subject line read: "Nervousness is setting in." Supplemental App. 83. In the email, Manafort wrote that "the properties go to auction on Dec[.] 21" and that he would appreciate an update on the Union Street Loan. Supplemental App. 83.

Calk then emailed Raico, without copying Manafort, regarding the status of TFSB's efforts to sell the Summerbreeze Loan to BofI, which would have allowed TFSB to extend the Union Street Loan without violating its legal lending limit. Raico responded that BofI was still refusing to assume the full value of the Summerbreeze Loan.

In the second half of December 2016, Manafort repeatedly reached out to Anthony Scaramucci ("Scaramucci"), a member of the PTT directly involved in vetting candidates for sub-Cabinet level positions, to advance Calk's appointment. On December 15, 2016, while the Union Street Loan was still pending, Manafort contacted Scaramucci and asked Scaramucci to interview Calk for Secretary of the Army. Scaramucci advised Manafort that another candidate was likely to be nominated for Secretary of the Army but agreed to arrange for Calk to be interviewed for Under Secretary of the Army.

BofI did not agree to buy the Summerbreeze Loan. At first, Calk was hesitant about TFSB directly issuing the Union Street Loan, informing Manafort's lawyer that TFSB was "in no way scheduling a closing until th[e] loan is fully structured, underwritten and approved" and that "[TFSB was] working very hard

to help find solutions to help [Manafort] out in his hour of need." Supplemental App. 85; Trial Tr. 493-94.

On the evening of December 21, 2016, Scaramucci texted Manafort about Calk, asking: "Would he take under. [sic] Secretary of the Army? Are we double sure[?]" Supplemental App. 95. Scaramucci then added: "If so I think we can get it done." Supplemental App. 95. Within minutes of Scaramucci's texts, Manafort and Calk were on the phone. After an eleven-minute call with Calk, Manafort informed Scaramucci via text: "Yes he will def [sic] take it." Supplemental App. 95.

The next day, Calk called Raico and directed him to prepare to extend the Union Street Loan to Manafort, regardless of whether BofI would buy the Summerbreeze Loan. Calk explained to Raico that TFSB would fund the $6.5 million loan by causing the Holding Company to acquire part of the loan exposure. By doing so, TFSB could issue the Union Street Loan without exceeding the limits on amounts lent to a single client. Calk stated that Manafort was "influential" with "other people and a few other situations at hand." Supplemental App. 50. Calk personally sent Manafort a term sheet that he described as a representation of their discussion on the eleven-minute call, along with an offer to close the next week.

After Scaramucci's exchange with Manafort, Scaramucci and Calk spoke by phone. Calk sent Scaramucci information about the work he had done on the Trump Campaign, and later, his resume, biography, and a list of potential roles for him in the Trump Administration. Calk was eventually offered an interview at Trump Tower with the team conducting the initial vetting of candidates for

potential roles in the administration. Scaramucci stated that it was not uncommon for people to ask him for interviews with the PTT, that although he had previously arranged interviews for people as a favor, he did so "[r]arely," and that he had never charged money for such referrals. App. 294-95. Scaramucci also stated that "in most cases" he turned down requests for interviews, Trial Tr. 312, but that he passed Calk's name along for an interview as "a favor for Paul Manafort," Trial Tr. 362.

The Union Street Loan closed around January 4, 2017. As Calk had proposed, to comply with TFSB's lending limits, the Holding Company purchased a portion of the loan exposure. The Holding Company had never before made such a purchase.

On January 9, 2017, Calk flew to New York for an interview at Trump Tower with the PTT for the position of Under Secretary of the Army. Calk spent approximately $1,800 on the trip. Calk spoke with Manafort multiple times in the days leading up to the interview. Calk was interviewed by the PTT at the team's Manhattan offices the next day. Calk referred to Manafort by name in a thank you email he sent to one of his interviewers.

The Union Street Loan was funded on January 17, 2017, a week after Calk's interview. The next day, the foreclosure proceeding on Manafort's Brooklyn property was dismissed, as Manafort used the funds from the Union Street Loan to terminate the foreclosure action.

Calk was not selected for a position in the Trump Administration.

## II.     The OCC Investigation and Manafort Conviction

On March 29, 2017, the Wall Street Journal published an article regarding the $16 million in loans extended by TFSB to Manafort. An officer with the Office of the Comptroller of the Currency (the "OCC") read the article and began to question whether the loans may have violated TFSB's statutory lending limits. The OCC convened a same-day meeting in person at TFSB. Calk attended, introduced himself as a "senior economic advisor to the President," and accused the OCC examiners of political bias. Trial Tr. 975-76. During the meeting, the OCC officers asked Calk if he was aware that Manafort's properties had been in foreclosure. Calk denied knowing about the foreclosures.

In October 2017, Manafort was charged with federal crimes. Manafort was convicted of making fraudulent representations in his loan applications to TFSB. *See United States v. Manafort*, Crim. Action No. 17-0201-01 (ABJ) (D.D.C. Sept. 14, 2018).

In July 2018, TFSB asked for a meeting with senior OCC officials. Calk began the meeting by stating that he had not sought a position in the Trump Administration.

## III. The Grand Jury Investigation and Calk's Indictments

### A. The Initial Indictment

In May 2019, Calk was indicted on charges of financial institution bribery in violation of Section 215(a)(2). The indictment alleged that Calk had corruptly solicited, accepted, and agreed to accept Manafort's assistance in obtaining a position in the Trump Campaign and the Trump Administration, intending to be influenced and rewarded in exchange for facilitating approval of Manafort's loan applications with TFSB.

### B. The Rigby Subpoena

In May 2020, ahead of the original September 2020 trial date, the Government identified Major General Randall Rigby ("Rigby"), a member of TFSB's board, as a potential trial witness and served him with a trial subpoena. Before the September 2020 trial date, the Government asked Rigby to meet voluntarily, and Rigby declined.

Calk's trial date was repeatedly postponed because of COVID-19. After each delay, a new trial date was set, and the Government again subpoenaed Rigby and sought a preliminary meeting. Rigby consistently declined to meet with the prosecutors. In January 2021, the court postponed the trial until June 2021. The Government reconvened the grand jury and, on February 12, 2021, served Rigby with a subpoena requiring him to appear before the grand jury in New York. Rigby then moved to quash the subpoena or to modify it so that he could testify remotely and avoid travel.

## C.    Calk's Objection

Because Rigby's motion disclosed that the Government had issued the grand jury subpoena after repeated attempts to secure a pre-trial meeting with Rigby, Calk raised to the district court the impropriety of using the grand jury to compel a meeting with a trial witness and requested an opportunity to be heard. After the Government consented to take Rigby's testimony remotely by videoconference, the district court determined that Rigby's motion to quash or modify the subpoena was moot. During the proceeding, the prosecution offered assurances that it would question Rigby only as part of its investigation into whether there was a conspiracy to commit financial institution bribery and that Calk would be able to seek a proper remedy before trial if the questioning was improper.

## D.    The Reopened Grand Jury and Rigby's Testimony

On March 4, 2021, Rigby testified before the grand jury from his home in Illinois. The Government's questioning of Rigby addressed, among other things, information Calk had or had not shared with Rigby and the TFSB Board about the Manafort loans and Calk's efforts to secure an appointment in the Trump Administration, Rigby's knowledge of Section 215(a)(2), whether TFSB had adopted any anti-bribery practices or policies, and conversations Rigby and other TFSB Board members had with Calk about the Wall Street Journal article regarding the Manafort loans.

The grand jury investigation closed soon after Rigby finished his testimony. Shortly after Rigby was excused, the prosecution called an FBI agent, James

Hilliard ("Hilliard"), to summarize the investigation. To guide his grand jury testimony, Hilliard put on a PowerPoint presentation. The presentation made no reference to any of Rigby's testimony.

### E.    The Superseding Indictment

On March 4, 2021, the Government filed a two-count Superseding Indictment. Count One charged Calk with financial institution bribery in violation of 18 U.S.C. § 215(a)(2). Count One alleged that Calk "corrupt[ly]" caused TFSB to issue "millions of dollars in high-risk loans to a borrower in exchange for a personal benefit." App. 152. Specifically, the Superseding Indictment alleged that, from at least July 2016 "up to" and including January 2017, Calk "did corruptly solicit" and "corruptly accept and agree to accept[] a thing of value exceeding $1,000" — to wit, Manafort's "assistance in obtaining a position with the Presidential Campaign and the incoming presidential administration" — intending to be influenced and rewarded in connection with the extension of loans totaling approximately $16 million to Manafort. App. 174-75. Count Two charged Calk with conspiracy to commit financial institution bribery in violation of 18 U.S.C. § 371. The Superseding Indictment made no reference to any evidence gathered during the reopened grand jury investigation, and it made no reference to Rigby.

### IV.    The Trial

The trial against Calk began on June 22, 2021, and ended on July 13, 2021. Calk moved to preclude the Government from calling Rigby as a trial witness and from presenting any other evidence or testimony derived from Rigby's grand jury

testimony, arguing it had been obtained through the improper use of a grand jury subpoena for the dominant purpose of preparing for trial. The Government opposed the motion, contending that, because a superseding indictment was returned after the grand jury heard Rigby's testimony, the subpoena was proper. The Government submitted an affidavit explaining that it had sought Rigby's testimony in support of its investigation of the conspiracy charge. The district court concluded that the Government had used the grand jury subpoena principally to support the conspiracy charge and not for trial preparation. The district court, therefore, denied Calk's pretrial motion to preclude Rigby's testimony and other evidence the Government derived from his grand jury testimony.

## V.   Verdict and Post-Trial Motions

The jury returned a verdict of guilty on all counts. At the end of trial, Calk renewed his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the evidence was insufficient as to both the "thing of value" and "corruptly" elements of Section 215(a)(2). The district court rejected Calk's motion by written order. The district court then sentenced Calk to 366 days' imprisonment, followed by two years of supervised release, and imposed a $1.25 million fine. The district court granted Calk bail pending appeal.

Calk then filed this appeal.

**STANDARD OF REVIEW**

**I.**

We review questions of the sufficiency of the evidence, including embedded questions of statutory interpretation, *de novo*. *See United States v. Jones*, 965 F.3d 190, 193-94 (2d Cir. 2020). A jury verdict must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We review challenges to jury instructions *de novo* as well, "reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003).

**II.**

Although a district court's determination that a subpoena "does not constitute an abuse of the grand jury process" is entitled to some deference, the question is one of the "application of a legal standard" and is therefore subject to "more scrutiny than would be appropriate under the 'clearly erroneous' standard." *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985).

**DISCUSSION**

Calk appeals from his convictions for financial institution bribery in violation of 18 U.S.C. § 215(a)(2) and conspiracy to commit financial institution bribery in violation of 18 U.S.C. § 371. The financial institution bribery statute makes it a crime for "an officer, director, employee, agent, or attorney of a financial

institution" to "corruptly solicit[] or demand[] for the benefit of any person, or corruptly accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215(a)(2).

An officer convicted under the financial institution bribery statute "shall be fined not more than $1,000,000 or three times the value of the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted, whichever is greater, or imprisoned not more than 30 years, or both." *Id.* Moreover, "if the value of the thing given, offered, promised, solicited, demanded, accepted, or agreed to be accepted does not exceed $1,000," a convicted defendant, "shall be fined . . . or imprisoned not more than one year, or both." *Id.*

As relevant to Calk's appeal, the parties agree that to secure Calk's felony conviction under Section 215(a)(2), the Government was required to prove that Calk: (1) "corruptly" (2) solicited or accepted (a) "anything of value" (b) worth more than $1,000. A jury convicted Calk of corruptly accepting Manafort's assistance — a thing of value — in his pursuit of appointments to the Trump Campaign and the Trump Administration. That jury further concluded that Calk valued Manafort's assistance at more than $1,000 and that, in exchange, Calk facilitated TFSB's approval of Manafort's loan applications. On appeal, Calk brings sufficiency-of-the-evidence and jury-instruction challenges that turn almost entirely on his contention that the district court misconstrued "corruptly" and "anything of value" as used in Section 215(a)(2). Calk does not develop any argument on appeal independent of his statutory interpretation claims that the evidence is insufficient to support his conviction under Section 215(a)(2).

Calk further asserts that his conviction under 18 U.S.C. § 371 for conspiracy to commit financial institution bribery must also be reversed because the evidence to support the "anything of value" and "corruptly" elements is insufficient "under the proper construction of [those] statutory terms." Appellant's Br. 23, 43 & n.8.

## I. "Corrupt" Conduct

## A. Statutory Interpretation

We first address Calk's challenge to the meaning of "corruptly" as used in Section 215(a)(2). In relevant part, Section 215(a)(2) sanctions a financial institution officer who "corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215(a)(2). The district court instructed the jury that to act "corruptly" for purposes of Section 215(a)(2) is "to act voluntarily and intentionally with an improper motive or purpose to be influenced or rewarded." Supplemental App. 14-15.

On appeal, Calk contends that to prove he acted "corruptly" under Section 215(a)(2) the government was required to show that he breached his duty to act in the bank's best interest. Calk may also be taken to argue that his actions were not "corrupt" within the meaning of Section 215(a)(2) if such conduct, although motivated by an improper purpose, was ultimately beneficial to the financial institution. In Calk's view, Section 215(a)(2) does not "cover every technical conflict of interests or case of mixed motives, but instead . . . prohibit[s] only a

bank officer's actual betrayal of a bank's interests."  Appellant's Br. 41.  We find that Calk's objections are without merit.

### 1.   "Corrupt" Conduct Requires Improper Purpose

The district court interpreted "corruptly" consistently with our prior holdings in cases involving 18 U.S.C. § 666, which prohibits theft or bribery in connection with programs that receive federal funds.  Those cases explain that "[w]hen a statute uses the word 'corruptly,' the government must prove . . . that a defendant acted 'with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.'"  *United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019) (quoting *United States v. McElroy*, 910 F.2d 1016, 1021-22 (2d Cir. 1990)).  *See also Corruptly*, Black's Law Dictionary (11th ed. 2019) ("As used in criminal-law statutes, corruptly usu[ally] indicates a wrongful desire for pecuniary gain or other advantage.").

Calk contends that the district court erred in relying on anti-bribery statutes such as 18 U.S.C. § 666 and § 201, which proscribe public official bribery, for guidance on the meaning of "corruptly" as used in Section 215.  That is so, Calk argues, because "[t]he purpose of [Section] 215 is substantially different from public corruption statutes such as 18 U.S.C. [§ 666] and [§ 201], which also require that a defendant act 'corruptly.'"  Appellant's Br. 40.

In Calk's view, Section 666 and Section 201 "are intended to prohibit 'the corrupt selling of what our society deems not to be legitimately for sale.'"  Appellant's Br. 40-41.  By contrast, he adds, Section 215(a)(2), which targets the conduct of employees of private financial institutions and covers only institutions

whose deposits are insured by the federal government, "regulates commercial transactions which undisputedly *are* 'for sale.'" Appellant's Br. 41. But even if Calk's interpretation of these anti-bribery statutes is correct, Section 215 also clearly contemplates and prohibits "corrupt" conduct in connection with the commercial transactions it regulates.

While "the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used," *Yates v. United States*, 574 U.S. 528, 537 (2015) (citation omitted), we see no reason why analogous anti-bribery statutes — and 18 U.S.C. § 666(a)(1)(B) in particular — cannot provide guidance for the proper interpretation of "corruptly" as used in Section 215(a)(2).

The elements of Section 666(a)(1)(B) closely mirror those of Section 215(a)(2), banning public officials from "corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value" worth $5,000 or more, "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of a public organization, government, or agency. Congress amended Section 666 into essentially its current form in 1986, the same year that it revised Section 215(a) by adding the word "corruptly" to that provision. *See* Act of Aug. 4, 1986, Pub. L. No. 99-370, § 2, 100 Stat. 779, 779. Indeed, the committee report on Section 666's 1986 amendment states that Section 666 "parallels the bank bribery provision (18 U.S.C. [§] 215)." H.R. Rep. No. 99-797, at 30 n.9 (1986).

There is nothing that we have found that suggests that "corruptly" as used in Section 215(a) should have a different meaning from its use in Section 666(a)

simply because Section 215(a)(2) involves employees of government-insured financial institutions rather than public officials.  And Calk develops no other argument on that front.  Therefore, his challenge fails.

## 2.    "Corrupt" Conduct Need Not Entail a Breach of Duty

Calk nonetheless contends that he acted "corruptly" under Section 215(a)(2) only if he breached a duty to the financial institution, TFSB.

Section 215(a)(2) requires the Government to prove that a defendant acted: (1) "corruptly" and (2) "intending to be influenced or rewarded" in connection with any financial business or transaction.  Calk first argues that, because the Government "must prove both" elements to support a conviction under Section 215, "corruptly" must be read to entail a breach of official duty so as not to "nullify th[at] statutory term."  Appellant's Br. 38.  But this argument is dubious on its face. A plain reading of Section 215(a) shows that the "corruptly" and the "intending to be influenced or rewarded" requirements already have independent meaning, as not every action that results in some benefit to an officer of a financial institution will necessarily constitute "corrupt" conduct within the meaning of Section 215(a)(2).

Calk next argues that the history and purpose of Section 215(a)(2) support a narrow reading of "corrupt" conduct to entail a breach of duty.  We are not persuaded.

In 1986, Congress amended a prior version of Section 215(a) that made "*any* seeking or acceptance [of a thing of value] criminal," to ensure that only those bank officers who engaged in *corrupt* actions could be prosecuted.  *See* H.R. Rep. No. 99-

335, at 6 (1985). The relevant legislative history indicates that Congress's primary purpose in altering Section 215(a) was to narrow its scope, so that "innocent persons who are not engaged in culpable or wrongful conduct" would not be prosecuted. *Id.* at 5. To that end, Section 215(a) was changed to require that a bank officer act "corruptly." Congress, however, stopped there, without further suggesting that a bank officer must breach a fiduciary duty in order to act corruptly.

Moreover, when interpreting other statutes proscribing bribery that, like Section 215(a), require a finding that an officer acted "corruptly," we have held that an officer acts "corruptly" even if the officer does not breach any specific official duty.[3] For example, where a defendant was convicted of bribing United Nations officials in violation of federal statutes worded similarly to Section 215(a), we rejected the defendant's claim that the district court failed properly to instruct the jury that to find the defendant acted corruptly, "the jury was required to find . . . [the defendant's] intent to . . . *breach* an 'official duty.'" *Ng Lap Seng*, 934 F.3d at 142. *See also United States v. Alfisi*, 308 F.3d 144, 150 (2d Cir. 2002) (rejecting a defendant's contention that a district court erred by failing to instruct a jury that "the term 'corruptly' requires evidence of an intent to procure a violation of the

---

[3] Calk principally relies on a string of cases where we have observed that "[b]ribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty." *United States ex rel. Sollazzo v. Esperdy*, 285 F.2d 341, 342 (2d Cir. 1961). *See also United States v. Jacobs*, 431 F.2d 754, 759 (2d Cir. 1970); *United States v. Zacher*, 586 F.2d 912, 915 (2d Cir. 1978); *United States v. Rooney*, 37 F.3d 847, 852-53 (2d Cir. 1994). These cases are readily distinguishable, as we explained most recently in *Ng Lap Seng*, 934 F.3d at 143-45.

public official's duty"); *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995). Calk gives us no valid reason why Section 215(a)(2) should be read differently.

### 3.   **"Corrupt" Actions May Still Be Beneficial to the Financial Institution**

Calk, however, may be taken to argue that he acted "corruptly" only if his actions were against the financial interests of the bank. Because the Summerbreeze Loan and Union Street Loan ultimately turned TFSB a profit, Calk appears to contend, his actions facilitating the loan applications should not be regarded as "corrupt." We are unpersuaded.

As we have previously observed, a correct outcome does not cleanse a corrupt decision-making process. For instance, "if a party to litigation were to pay a judge money in exchange for a favorable decision, that conduct would — and should — constitute bribery, even if a trier of fact might conclude *ex post* that the judgment was on the merits legally proper." *Alfisi*, 308 F.3d at 151.

A bank officer likewise can act "corruptly" if unduly influenced by an improper purpose to carry out a financial transaction, even if the financial transaction ultimately led to a profitable outcome for the bank. Calk's suggestion that Section 215(a)(2) merely prohibits acts that would result in a net loss for the bank takes too narrow a view of the public interest 18 U.S.C. § 215 seeks to protect — namely, the public's trust in financial institutions. A profitable financial operation, like a correct judicial decision, if improperly influenced by bribery or corruption, can lead to an erosion of the public trust in the relevant institution that Congress sought to protect.

### 4. "Corrupt" Conduct May Be Partially Motivated by a Proper or Neutral Purpose

Calk further contends that "the 'corruptly' requirement is not satisfied if a bank officer charged with bank bribery believed he was acting in the bank's best interests." Appellant's Br. 41. Thus, Calk argues, if by facilitating Manafort's loans, Calk sought even minimally to financially benefit the bank, he cannot be found to have acted corruptly. Again, we are not persuaded.

In the context of public official bribery, we have stressed that a "valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." *United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990). Similarly, in a case involving a prosecution of a county executive for bribery, we affirmed instructions that required the jury to determine whether "the defendant accepted or solicited [a] thing of value, *at least in part*, . . . intending to be influenced" in connection to official business. *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (emphasis added). On appeal, Calk does not develop any valid argument that we should treat defendants differently for purposes of Section 215(a)(2).

\* \* \*

For these reasons, we conclude that Calk's statutory interpretation challenges as to what constitutes "corrupt" conduct for purposes of Section 215(a)(2) are without merit. And insofar as his challenges to the sufficiency of the

evidence and to the district court's jury instructions[4] turn on the same questions of statutory interpretation just addressed, we find that those challenges are also without merit.

## B.    Sufficiency of the Evidence

Calk separately contends that the Government failed to produce sufficient evidence that would lead a reasonable jury to conclude that he, in fact, acted "corruptly."  We disagree.

As an account of the granting of Manafort's loans indicates, there is much evidence in the record that Calk's efforts to influence TFSB's review and eventual approval of Manafort's loan applications were motivated by Calk's desire to build a political relationship with Manafort and to secure his assistance in seeking an appointment in the Trump Administration.  Furthermore, the evidence shows that Calk intermingled and connected TFSB's expedited review and approval of Manafort's loan applications to Manafort's assistance in Calk's pursuit of an appointment in the Trump Administration.  The evidence presented at trial, including witness testimony, also showed that Calk was aware that Manafort had defaulted on prior loans and that some of his properties were in foreclosure while TFSB was reviewing Manafort's loan applications.  And the evidence shows that Calk nonetheless pushed repeatedly for Manafort's loans to be approved by TFSB.

---

[4] Calk does mention in passing that the district court "misled the jury into believing it should find Calk acted 'corruptly' if it found a quid pro quo, regardless of whether he believed he was doing something wrongful."  Appellant's Br. 44.  Having failed to address how the alleged instructional error was prejudicial, however, this argument is not sufficiently developed for appellate review. *See Aina-Marshall*, 336 F.3d at 170.

Such evidence readily allowed a reasonable jury to infer that Calk "corruptly" solicited or accepted a "thing of value" — Manafort's assistance and support of Calk's political aspirations — in exchange for facilitating certain financial transactions with TFSB.

## II.     "Thing of Value" Worth Over $1,000

### A.     Statutory Interpretation

Calk next contends that his convictions must be reversed because a "thing of value" under Section 215(a)(2) must have an "objective market value" and cannot include intangibles or things that are subjectively valuable to the defendant.  Appellant's Br. 26-30.  We find Calk's objection to be without merit.

Section 215(a)(2)'s plain language calls for a broad reading of what constitutes a "thing of value."   The statute specifically refers to "anything of value," 18 U.S.C. § 215(a)(2), and the Supreme Court has "repeatedly explained that the word 'any' has an expansive meaning," *Babb v. Wilkie*, 140 S. Ct. 1168, 1173 n.2 (2020) (internal quotation marks and citation omitted).  The plain meaning of "any" is "one or some indiscriminately of whatever kind" or "one selected without restriction."   *Any*, Merriam-Webster Dictionary Online.   "Value," in turn, can mean "the monetary worth of something," but also "relative worth, utility, or importance."  *Value*, Merriam-Webster Dictionary Online.

Indeed, "anything of value" as used "in bribery and related statutes has consistently been given a broad meaning."  *United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983).  The words "thing of value" are "found in so many criminal statutes throughout the United States that they have in a sense become words of

art." *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979). Specifically, "the phrase is generally construed to cover intangibles as well as tangibles" and has been held to include "amusement," "[s]exual intercourse, or the promise of sexual intercourse," a "promise to reinstate an employee," "an agreement not to run in a primary election," and the "testimony of a witness." *Id.*

"[A]nything of value," as used in Section 215(a)(2), can include intangibles with a subjective value to the parties, even if they do not have an objective market value. In determining whether there is a "thing of value," we have observed, what matters is "the value that the defendants subjectively attached to the items received." *Williams*, 705 F.2d at 623. *See also United States v. Ostrander*, 999 F.2d 27, 31 (2d Cir. 1993) ("[I]t is enough if the item received was regarded as a benefit by the recipient, whether or not others might have taken a different view of its value."); *United States v. Rosenthal*, 9 F.3d 1016, 1023 (2d Cir. 1993) (explaining that the "critical inquiry" is whether the "thing of value" was believed to have value to the defendant). A recommendation for a job, for example, may not be typically given a specific market value, but it can still be highly valuable to the job seeker. Accordingly, we reject Calk's argument that "anything of value" in Section 215(a)(2) refers only to things with an objective pecuniary value.

## B.     Sufficiency of the Evidence – "Thing of Value"

Calk further argues that the Government failed to introduce sufficient evidence that would allow a jury to infer that Calk believed he was facilitating approval of Manafort's loans in exchange for a "thing of value." We disagree. The evidence in the record is sufficient to permit a reasonable jury to conclude both

31

that Calk sought to facilitate Manafort's loans in exchange for Manafort's political assistance in Calk's pursuit of an appointment to the Trump Administration and that Manafort's assistance, including his endorsement, had subjective value to Calk.

The evidence suffices to show that Calk solicited and received Manafort's political assistance — a "thing of value" — in exchange for facilitating Manafort's loans from TFSB. Manafort told Calk that he was "involved directly" with the presidential transition, App. 495, and Calk was aware that Manafort was highly influential and well-connected with both the Trump Campaign and the PTT. When Calk and Manafort discussed Manafort's loan applications, they both repeatedly referenced Manafort's connections with the Trump Campaign and Trump Administration, and Calk repeatedly sought out Manafort's guidance and endorsement in his attempts to join the Trump Administration.[5]

And the record shows that Calk assigned a high, subjective value to Manafort's political assistance. In pursuit of an appointment in the Trump Administration, Calk sought the advice and support of several people he thought had any connection with the incoming administration. But Calk especially valued Manafort's assistance. For example, Calk repeatedly sent Manafort his resume and list of preferred roles in the Trump Administration so that Manafort or other members of the PTT would "have [him] successfully chosen by the President-

---

[5] The Government also contends that Calk's appointment to NEAC is a "thing of value" sufficient to support a conviction. But while Calk's appointment to NEAC might well be sufficient on its own, the record does not clearly indicate that Calk traded a position in NEAC for approval or disbursement of any of the three loans Manafort sought from TFSB.

Elect." Supplemental App. 72. Trial witnesses, including TFSB employees, also remarked that Calk regarded Manafort's assistance as highly valuable.

Calk's perception that Manafort's support was valuable was not groundless. For example, Scaramucci testified that Manafort was influential within the Trump Campaign and the PTT and that individuals with Manafort's endorsement would likely be offered an interview with the PTT.

Thus, there is sufficient evidence in the record that could lead a reasonable jury to conclude that Calk viewed Manafort's assistance, including his endorsement for an interview before the PTT, as the "thing of value" sought by Calk.

## C.    Jury Instructions

Calk next challenges the adequacy of the district court's instructions to the jury regarding how to establish whether the "thing of value" that was solicited or accepted was worth over $1,000. The district court instructed the jury that the Government was required to "prove beyond a reasonable doubt . . . that the thing of value accepted, or agreed to be accepted, or solicited, or demanded by [Calk] had a value greater than $1,000." Supplemental App. 16. The district court additionally noted that the "government need not prove the exact value of the thing of value, as long as there is proof beyond a reasonable doubt that the value exceeded $1,000" and that "[t]he value of the thing of value may be measured by its value to the parties, the value of what it is exchanged for or its market value." Supplemental App. 16. We see no error in the district court's instructions.

To sustain a felony conviction under Section 215(a)(2), a jury must conclude that the defendant sought a "thing of value" worth more than $1,000. As the statute directly references a currency amount, a jury must assign the "thing of value" a monetary amount. That does not mean that a "thing of value" is valuable, for purposes of Section 215(a)(2), only if it has an objective monetary value. But the statute does require that a monetary value be assigned to the financial institution officer's subjective value of the "thing." And, importantly, a jury must establish the "value" of the "thing of value" by relying on objective evidence.[6]

The conduct of the parties, and in particular the value of what the bribe recipient is willing to trade or facilitate in exchange for the bribe, can assist a jury in determining whether the monetary value of a "thing of value" exceeds $1,000. As other circuit courts have observed, to "establish the value of the intangible thing of value," a court may look to "the conduct of the bribed defendant and her briber." *United States v. Townsend*, 630 F.3d 1003, 1012 (11th Cir. 2011). For example, the Fifth Circuit found that conjugal visits were a "thing of value" under Section 666(a)(1)(B) to which a bribe recipient assigned a value exceeding $5,000 because a bribe-giver "was willing to pay [the bribe recipient] $6,000 a month plus

---

[6] While Section 215(a)(2) requires that the Government show that the "thing of value" was worth *more* than $1,000 through objective evidence, the statute does not require that the Government establish the specific monetary value of the "thing of value." At sentencing, for example, the district court observed that the Government did not "establish that the value of what was given or received in the bribe exceeded $2,500," App. 577, as required to apply a sentencing enhancement. Nonetheless, as the district court correctly observed, all that is necessary to uphold a felony conviction under Section 215(a)(2) is that the value of the "thing of value" exceed $1,000. Because Calk does not develop on appeal any argument challenging his sentence, we need not now address whether the district court's observation was correct.

$1,000 for each visit."  *United States v. Marmolejo*, 89 F.3d 1185, 1194 (5th Cir. 1996). A jury, thus, can assess the monetary value of an intangible and subjectively valuable bribe by assessing the monetary value of the thing the briber seeks to secure.[7]

## D.    Sufficiency of the Evidence – "Worth More Than $1,000"

Calk next contends that the evidence was not sufficient to allow a reasonable jury to conclude that Manafort's assistance was worth more than $1,000 to Calk. To prove that Calk valued Manafort's assistance at more than $1,000, the Government at trial pointed to the fact that Calk was willing to spend $1,800 traveling to his interview with the PTT.  At trial, the Government also pointed to the fact that Manafort received loans totaling $16 million in exchange for his political assistance as evidence that Calk valued Manafort's assistance at more than $1,000.  Calk argues that neither of these is sufficient to uphold the jury's finding that he solicited or received a "thing of value" worth more than $1,000.

To begin, we consider the $1,800 spent by Calk to travel to his interview with the PTT.  The Government contends on appeal that the $1,800 is indicative of how much Calk valued Manafort's assistance.  Calk, correctly, objects to such a conclusion, because the $1,800 does not indicate how much Calk valued Manafort's assistance.  Instead, the $1,800 most clearly reflects how much Calk

---

[7] To the extent that Calk means to argue that Manafort's assistance to Calk was not worth more than $1,000 because it was "of the sort generally given for free, rather than purchased," Appellant's Br. 31-32, we are not persuaded.  The mere fact that one *chooses* not to charge for a "thing of value" does not mean that such a "thing" lacks value or cannot be assigned a value.

valued the *interview* and his travel preferences, including his choice to stay at a luxury hotel.

But the record includes other evidence that could lead a reasonable jury to conclude that Calk valued Manafort's assistance at more than $1,000. Calk was willing to put millions of dollars of TFSB's resources on the line by approving Manafort's loans. As the primary shareholder of the Holding Company that controlled TFSB, by risking TFSB's resources, Calk was indirectly putting his own assets on the line. At the time TFSB was reviewing the Union Street Loan, Calk was aware that Manafort was facing an imminent foreclosure on his Brooklyn townhouse, which was valued at several million dollars. By facilitating and expediting review of the Union Street Loan, Calk offered Manafort a lifeline that the evidence suggests, under the circumstances, few, if any, other banks would have been willing to undertake. And, in assisting Manafort's loan applications, Calk also risked incurring significant regulatory investigations or fines.

All this, clearly evident in the record, is sufficient evidence for a reasonable jury to conclude that Calk valued Manafort's assistance at more than $1,000.[8]

## III.   Grand Jury Proceedings

Lastly, we consider Calk's challenge to the propriety of the Government's grand jury subpoena against Rigby and the district court's admission of testimony by Rigby. Calk contends that the Government improperly issued a grand jury

---

[8] Insofar as Calk's challenges to his conviction under 18 U.S.C. § 371 for conspiracy to commit financial institution bribery turn on the same challenges just rejected, we find that they are also without merit.

subpoena against Rigby. The grand jury subpoena was, Calk argues, designed impermissibly to facilitate trial preparation, instead of supporting an investigation into a superseding indictment for conspiracy. Calk claims that the district court further erred when it allowed Rigby to testify during trial. While Calk raises, with particularity, serious reasons to question the validity of the grand jury subpoena, the district court properly determined that the Government provided a sufficient *bona fide* justification for the issuance of a grand jury subpoena. Calk, in answer, provides no reason to find that the Government's justification was pretextual or otherwise invalid.

As a general rule, the grand jury process is afforded a "presumption of regularity." *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 109-10 (2d Cir. 1998). And a grand jury investigation "is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972) (quoting *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970)). For that reason, "[p]ost-indictment action is permitted to . . . prepare superseding indictments against persons already charged." *United States v. Jones*, 129 F.3d 718, 723 (2d Cir. 1997).

Nevertheless, courts may not ignore possible abuse of the grand jury process, as "the grand jury is not meant to be the private tool of a prosecutor." *United States v. Fisher*, 455 F.2d 1101, 1105 (2d Cir. 1972). Ensuring the regularity of the grand jury process is especially important because of the risks for abuse that inhere in proceedings over which trial and appellate courts rarely have insight. Relative to defendants, prosecutors already have significantly greater powers and leverage to gather evidence in preparation for trial. And, without effective

safeguards, prosecutors could otherwise abuse the grand jury subpoena and skirt the limits imposed on discovery by the Federal Rules of Criminal Procedure.

It is "improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment." *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994). *See also United States v. Punn*, 737 F.3d 1, 6 (2d Cir. 2013). A variety of factors may be relevant in assessing whether trial preparation is the dominant purpose for issuing a grand jury subpoena. We have noted, for instance, that "[t]he timing of the subpoena casts significant light on its purposes." *Simels*, 767 F.2d at 29.

To determine whether trial preparation is the "sole or dominant purpose" for a grand jury subpoena, we have said that a burden-shifting framework applies. The defendant has the initial burden of presenting "concrete allegations of Government misconduct." *Leung*, 40 F.3d at 582. Once a defendant has put forward such allegations, the Government must "come forward with evidence of specific grand jury activity in connection with the . . . investigation," *id.*, and thereby show that the subpoena was not motivated by an improper purpose. The defendant then has the burden of showing that the government's explanation was a pretext for abusing the grand jury process by "utiliz[ing] a [g]rand [j]ury for the sole or dominating purpose of preparing an already pending indictment for trial." *Punn*, 737 F.3d at 6 (quoting *Simels*, 767 F.2d at 29).

So, as an initial matter, to overcome the presumption of regularity that attaches to a grand jury proceeding, the defendant, who bears the burden of persuasion, "must present particularized proof of an improper purpose." *Id.*

38

(quoting *Salameh*, 152 F.3d at 109). Therefore, at the initial stage, the defendant must identify concrete reasons for a court to question the Government's purpose for issuing a grand jury subpoena. *See Leung*, 40 F.3d at 582.

Calk satisfied this initial step by showing that the timing of the grand jury subpoena of Rigby raised serious questions regarding its validity. The Government had identified Rigby as a potential trial witness months earlier and had tried, for several months, to speak with him informally as the fourth trial date approached. Rigby consistently declined to meet with the prosecution. Only twenty months into the pendency of the case, with a trial date approaching and without any sense of what testimony Rigby would provide, did the prosecution subpoena Rigby to appear before the grand jury. By then, the investigation had gone on for several years, and there is certainly a strong argument that the prosecution could well have sought to subpoena Rigby before the first indictment was issued if the object had been testimony relevant to the indictment and not the trial.

Rigby's testimony, moreover, did not substantially change the course of the investigation. The Government alleges that it re-opened the grand jury and subpoenaed Rigby to bring a conspiracy charge against Calk. But the Government had already drafted a superseding indictment charging Calk with conspiracy in addition to substantive bank bribery prior to the subpoena. The Government conceded that it had been ready to file the draft superseding indictment charging Calk with conspiracy long before Rigby's testimony. Indeed, the Government presented the grand jury with the superseding indictment, including a conspiracy

charge, very shortly after Rigby concluded his testimony and without directly incorporating any of Rigby's testimony.

Under these circumstances, Calk presented valid reasons to question the propriety of the grand jury subpoena. A subpoena that is clearly not designed to elicit testimony that will inform an indictment or the decision not to indict or to supersede the indictment could well reflect an improper purpose like trial preparation. To be sure, such a showing does not exhaust a district court's inquiry; it does, however, shift the burden to the Government.

The Government principally contends that an affidavit stating that the grand jury subpoena was served for the purpose of continuing its investigation is sufficient to rebut Calk's claim. The U.S. Attorney's Office filed an affidavit stating that the Government subpoenaed Rigby before a grand jury for legitimate reasons. Although "[i]n nearly every case of alleged grand jury abuse, the government can and does argue that it is investigating other individuals or other crimes," *Punn*, 737 F.3d at 13, we need not decide whether the Government's representations, even in a sworn affidavit, can alone provide sufficient evidence that a subpoena was used for a legitimate purpose.

This is because here, the Government presented, and the district court properly considered, several factors that tended to show that the subpoena was, in fact, proper because it was connected to an ongoing investigation.

First, the Government offered evidence that the prosecution had hesitated to include a conspiracy charge until shortly before the trial date. The otherwise seemingly suspicious timing of the Rigby subpoena, therefore, reflected instead

the prosecution's ongoing doubts regarding the viability of the conspiracy claim. At oral argument, the Government stated that, as there was evidence Manafort was actively defrauding Calk and TFSB in his loan applications, the prosecution was unsure that it could establish that there was the "meeting of the minds" between Manafort and Calk that is required for a conspiracy. The Government further specified what additional evidence it needed for a conspiracy count, and that it had acquired such evidence during the late grand jury proceedings, and presumably in part from Rigby's testimony. Moreover, in its affidavit, the Government averred that, because the district court had pushed back the trial date several times over Calk's objections, and because the Government did not wish to create a litigation risk by causing further delay, it did not pursue the conspiracy count until the district court issued its final adjournment. Together, these assertions suggest that the Government had *bona fide* reasons for delaying the issuance of the Rigby subpoena.

Second, the Government provided evidence that the content of Rigby's testimony before the grand jury was directly linked to the ongoing investigation into the conspiracy charge, even if Rigby's testimony did not significantly change or inform the indictment. The district court examined the grand jury transcript and determined, in fact, that the questions Rigby was asked pertained to the Government's ongoing investigation into the conspiracy charge. And the Government provided a plausible explanation for why it believed Rigby could have information pertaining to the conspiracy charge. Lastly, the issuance of a superseding indictment charging Calk with conspiracy, at the conclusion of the grand jury proceedings, while neither necessary nor sufficient to rebut Calk's

assertions of impropriety, lends further plausibility to the Government's claim that the grand jury proceedings and the Rigby subpoena were part of a proper ongoing investigation.

All these constitute *bona fide* justifications given by the Government for issuing the Rigby subpoena. Calk did not, however, offer any evidence that might suggest that the Government's valid interest in expanding its investigation into a potential conspiracy charge through the grand jury was mere pretext. We therefore reject Calk's claim that the district court erroneously failed to preclude Rigby's testimony.

## CONCLUSION

We have considered all Calk's challenges to his convictions and find them to be without merit. Accordingly, we **AFFIRM** the judgment of conviction.